357 So.2d 924 (1978)
CHARLES N. CLARK ASSOCIATES, LIMITED and United States Fidelity & Guaranty Insurance Company
v.
DEPENDENTS OF CALVIN J. ROBINSON, Deceased.
No. 50222.
Supreme Court of Mississippi.
April 12, 1978.
*925 Harold W. Melvin, Laurel, for appellants.
Odom & Parrish, J. Ronald Parrish, Laurel, for appellee.
Before SMITH, LEE and COFER, JJ.
LEE, Justice, for the Court:
The administrative judge entered an order denying compensation benefits to the widow and children of Calvin J. Robinson on a finding that the evidence was insufficient to establish causal connection between the deceased's employment and his death in any reasonable, substantial degree by his employment, and that the primary diagnosis by Dr. Frank Jones of deceased's condition on October 8, 1973, was for an upper respiratory infection. The Workmen's Compensation Commission affirmed that order by a two-to-one decision, and, upon appeal to the Circuit Court of Jones County, the presiding judge reversed the order of the full Commission and entered an order granting compensation benefits to said widow and children. The employer-carrier have appealed here and assign the following error committed by the circuit court:
The court erred in reversing the Compensation Commission and the Administrative Law Judge, because the basic test is not whether the compensation claim is supported by substantial evidence, but whether the findings of the Workmen's Compensation Commission, either in allowing or denying the claim, is supported by substantial evidence.
Calvin J. Robinson was employed as a draftsman for Charles N. Clark Associates, Limited, in Laurel, Mississippi, from 1957 until October 8, 1973. In 1971, he began having severe problems with his back and his condition was diagnosed myofibrositis. Dr. Frank Jones, Hattiesburg, and Dr. Charles Hollingshead, Laurel, treated Mr. Robinson and prescribed strong sedatives and an exercise program for him. His condition worsened as time elapsed, he was admitted to the hospital for approximately one week and also was treated in New Orleans. On October 8, 1973, Robinson was suffering a great deal of pain in his upper back, and he went to Hattiesburg to see Dr. Jones. After examination and treatment by Dr. Jones and while returning to Laurel, he was involved in a one-car accident (striking a bridge abutment) which resulted in his death.
Appellants contend that there was substantial evidence before the Commission to the effect that Robinson's condition was not work-related and that his visit to Dr. Jones on October 8, 1973, was not work-related and was a personal visit. On the other hand, appellees argue that the evidence is overwhelming that his condition was work-related and that his trip to Dr. Jones was at the authorization and suggestion of his employer and was work-connected.

I.
Was Robinson's back condition work-related?
*926 Myofibrositis is an illness or condition affecting the muscles of the back, thorax and shoulders, and is extremely painful, so much so that medication offers little relief. Three witnesses, Mrs. Catherine Robinson (widow), Dr. Frank E. Jones, Jr., and Charles Clark (adverse witness), were called by the appellees to testify in the case. One witness, Dr. Charles Hollingshead, was called by appellants. It is undisputed that Robinson's work was not the original cause of his myofibrositis.
Mrs. Robinson testified that at the end of a day's work deceased was in much greater pain than at the beginning of the day, and that many times he could not sleep at night on account thereof. She stated that on the morning of October 8, 1973, deceased had such pain in his back that he went to Hattiesburg to see Dr. Jones for relief.
Charles Clark was an officer and principal stockholder of the appellant company. He testified that the deceased was a draftsman (Clark was also a draftsman) and that the work was arduous, involving stooping and pulling of the muscles and particularly affecting the back, shoulder and arm muscles.
Dr. Jones testified as follows:
"Q. What condition was he in when you saw him the last time?
A. At this time, I will refer to the findings of my physical examination, this was in October of 1973. At this time he was complaining of pain in his neck, upper back, and also at this time he had symptoms of upper respiratory infection, cough, rhinorrhea, which is a running nose, nasal and chest congestion. At this time he seemed to be quite withdrawn, the kind of findings you would see in a patient who was depressed.
Q. Did you examine his back on October the 8th?
A. I did.
Q. What was your conclusion with relationship to his back problem at that time?
A. Physical examination at that time revealed some tenderness of the paravertebral muscles of the neck and upper back. This is the finding you will find in somebody with musculus skeletal pain in the upper pelvic girdle and thoracic area. He complained of pain, but you could elicit tenderness and spasms of muscles, so this was consistent with what he was complaining of. He also, as I previously mentioned, had some nasal congestion and some of the findings that are consistent with acute upper respiratory infection.
Q. Were these problems that you diagnosed in relation to his back in October of 1973 essentially the same as those you found in February of 1973?
A. Yes.
* * * * * *
Q. Were you familiar with the type of work Mr. Robinson did at Clark Engineers?
A. Yes, I questioned him about this. It was my understanding that he was a draftsman. This kind of work requires a fairly fixed position in a sort of hunched position, therefore there's a possibility of over stressing certain muscle groups from being in this position for prolonged periods of time.
* * * * * *
Q. Do you have an opinion, doctor, based on reasonable medical certainty as to whether or not his work that he did at Clark Engineers aggravated, accelerated, or contributed to his back problems which you have outlined?
* * * * * *
A. You mentioned an unknown back problem, but the diagnosis here was myofibrositis, which is a musculus skeletal condition. Myofibrositis is the medical name for his back problem. Now, the [sic] answer the question, I certainly feel logically and based on what I know about what a draftsman does that the work certainly could have aggravated or exaggerated his condition.
Q. Is it your opinion that it probably did or that it did not?

*927 A. My opinion is that it did."
Dr. Hollingshead testified on cross-examination as follows:
"Q. What about that aspect of it?
A. If you say just aggravation, I would say that it's probable that it did aggravate. Before you asked if it was three (3) different things, the cause and I couldn't say it was not the cause, but as far as aggravation I could say that it is probable that this amount could aggravate an existing fibromyositis.
Q. So your testimony then if I understand it right is that it did not cause it, but in your opinion this amount of strain assuming the hypothetical to be true would have aggravated it, is that correct?
A. You ask if it was probable if it aggravated and I said yes that it was probable that it aggravated it."
The evidence is undisputed that Robinson's condition was aggravated by his work as a draftsman and there is no evidence, substantial or otherwise, to the contrary.

II.
Was Robinson's visit to Dr. Jones on October 8, 1973, in connection with a work-related condition and was the visit authorized and suggested by his employer?
Mr. Clark testified to the following:
"Q. Dr. Jones was an acquaintance of yours, Mr. Clark?
A. Yes, sir.
Q. And to the best of your recollection, would you tell us whether or not you recommended or suggested that Mr. Robinson see Dr. Jones in Hattiesburg on the day of October the 8th, 1973?
* * * * * *
A. I can't say definitely that I recommended that he go there on that date, but probably I did.
* * * * * *
Q. Mr. Clark, would you state whether or not in your best judgment, thinking back upon the events before Mr. Robinson's death whether or not you recommended that he go to Hattiesburg and see Dr. Jones on October the 8th, 1973?
* * * * * *
A. Yes, with this qualification. I am not sure of the exact date of October the 8th. Several days before Mr. Robinson was killed I called him in my office and I discussed with him his problem and I asked him to take some time off until he could get some relief, and I told him money was not an object that I would pay him for the time he was off, and my intention was for him to take off and see Dr. Jones or anyone that he had confidence in to help him determine what would be the best treatment for him to get well. He was a very trusted and loyal employee and it hurt me as a human and a personal friend to see him suffer with pain, and I wanted him to get some relief. He refused to take off a month, because he was overly conscientious. He wanted to stay there. He knew that there was a lot of work to be done. He knew that I would, I was sick myself, and he 
* * * * * *
Q. Mr. Clark, on the date of October the 8th, you did pay Mr. Robinson, did you not?
A. I paid Mr. Robinson's widow.
Q. For that day?
A. For that day and subsequent days. I gave his widow a check, I believe, for two thousand dollars and later severance pay of about twenty-five hundred that I felt Mr. Robinson had earned.
Q. Mr. Clark, correct me if I'm wrong, but tell me if I understand the substance of your testimony on a couple of issues and is the substance of it that to the best of your recollection you had recommended that Mr. Robinson see Dr. Jones and in addition to that that he was paid for the date of his death among other days.
* * * * * *
Q. Is that substantially correct?
A. Yes. Correct."
*928 The testimony of Dr. Jones set forth hereinabove reflects that he examined and saw Robinson for the pain in his back and shoulders and that the respiratory infection caused coughing, which increased such pain. Thus, the undisputed testimony is that Robinson went to see Dr. Jones at the authorization and suggestion of his superior, Mr. Clark, and that the examination covered the work-related condition of his back and shoulders. There is no substantial evidence to the contrary.
The law is established in this state that, if an order of the Workmen's Compensation Commission is supported by substantial evidence, then such order must be affirmed. The appellate court is not the judge of the weight and worth of the evidence. Knox Glass, Inc. v. Evans, 197 So.2d 784 (Miss. 1967); Perkinson v. Laurel Hot Mix, Inc., 252 Miss. 879, 174 So.2d 391 (1965); Freeman v. Mississippi Power & Light Co., 230 Miss. 396, 92 So.2d 658 (1957). It is also well established that the workmen's compensation law should be broadly and liberally construed. L. & A. Construction Co. v. McCharen, 198 So.2d 240 (Miss. 1967).
The crucial question here, which has not been decided by this Court, is whether or not under the facts set forth hereinabove, the death of Robinson is compensable. Larson's Workmen's Compensation Law, Vol. 1, § 13.13, at 3-379  3-383 (1972) states the following rule:
"When an employee suffers additional injuries because of an accident in the course of a journey to a doctor's office occasioned by a compensable injury, the additional injuries are generally held compensable. If the journey takes place immediately after the first injury occurs, the chain of causation is most readily visible, as when an employee was being rushed to a hospital following a compensable injury and sustained further injury when the ambulance was involved in a collision. But, quite apart from the element of immediacy, a fall or automobile accident during a trip to a doctor's office has usually been considered sufficiently causally related to the employment by the mere fact that a work-connected injury was the cause of the journey, without any necessity for showing that the first injury in some way contributed to the fall or accident. Of course, if the prior injury in any way contributes to the second accident, the case is that much stronger, as when pain or drugs or a weakened member may have played a part.
When compensation has been denied in this type of case, there has usually been some added factor weakening the causal connection, such as doubt about whether the trip was really authorized, or termination of the employment relation before the second injury occurred. Denials have also issued when the purpose of the trip was not treatment by a doctor, but examination for purposes of a workmen's compensation claim or for purposes of meeting the employer's requirement of a physical fitness certificate. Other denials in apparently related cases may be accounted for by the fact that the original injury was not work-connected, as where an employee suffers a heart attack and then attempts to connect it with the employment by pointing to the exertion of making his way to the employer's clinic or infirmary.
In the simple case, however, of a trip to the doctor's office necessitated by a compensable injury, the arguments put forward by the Kansas court in the Taylor case are difficult to answer. The court noted that the employer is under a statutory duty to furnish medical care, and that the employee is similarly under a duty to submit to reasonable medical treatment under the act. The provisions of the act, in turn, become by implication part of the employment contract. This being so, the better view appears to be that accidental injuries during a trip made pursuant to this statutory and contractual obligation are work connected."
The California case of Laines v. Workmen's Compensation Appeals Board, 122 Cal. Rptr. 139, 48 Cal. App.3d 872, 874 (1975), held that an injury sustained while an employee *929 was en route to receive current medical treatment for an earlier industrial injury arose out of and in the course of his employment and was proximately caused by the earlier injury, although the earlier injury, in itself, did not contribute to the second injury and the journey did not commence at the place of employment, and was compensable.
In Taylor v. Centex Construction Co., 191 Kan. 130, 379 P.2d 217 (1963), the Supreme Court of Kansas held that injuries sustained by an employee were compensable where the employee received an eye injury at work and was told by his employer to go to the doctor. During the trip, the employee was involved in an automobile accident, and the Court held the following:
"Under our Workmen's Compensation Act (G.S. 1961 Supp. 44-510) one of the primary duties of an employer to an injured workman is to furnish him such medical, surgical and hospital treatment as may be reasonably necessary to cure and relieve the workman from the effects of the injury and restore his health, usefulness and earning capacity as soon as possible. The liability of an employer to an employee arises out of a contract between them and the terms of the Act are embodied in the contract. [Omitting cases]. Section 44-518 provides that an employee must submit to medical treatment, or lose his benefits during the period that he refuses to submit to non-dangerous medical treatment.
The evidence is clear that the claimant suffered accidental injury to his eye on August 16, 1960, in the course of his employment. The respondent was obligated to furnish medical treatment, and that could only be procured at the doctor's office in Topeka. The directions of Mankin were sufficiently comprehensive to embrace all the treatment necessary to heal the eye. It would be folly to say that the claimant's trip going to and from the doctor's office did not `arise out of' the nature, conditions, obligations, or incidents of his employment... .
* * * * * *
In making the trip to the doctor's office, the hazards and risks of highway travel were incidents of his employment. Moreover, the words `causal connection' certainly do not mean that the accident must result directly and immediately from the performance of work for which the workman was employed. Such a narrowed interpretation would mean that whenever a workman was not directly engaged in the actual work to be done he would be without protection of the Act. [Omitting cases]." 191 Kan. at 135-136, 379 P.2d at 221, 224.
See also Whitington v. Industrial Commission, 10 Ariz. App. 461, 459 P.2d 740 (1969); and Immer and Company v. Brosnahan, 207 Va. 720, 152 S.E.2d 254 (1967).
Robinson had not filed a claim for benefits prior to October 8, 1973[1] but he suffered from a condition, which, although not caused by his work, was aggravated by same and was compensable. Universal Manufacturing Co. v. Barlow, 260 So.2d 827 (Miss. 1972). On October 8, 1973, he visited Dr. Jones primarily for treatment of that condition upon authorization and at the suggestion of his employer and accidentally lost his life in so doing. We hold that the principle expressed in Taylor v. Centex Construction Co., supra, and Laines v. Workmen's Compensation Appeals Board, supra, is a reasonable and sound rule and that it should be applied here. Therefore, the judgment of the circuit court is affirmed.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, BOWLING and COFER, JJ., concur.
NOTES
[1] evidence indicated that Robinson could not support his family on compensation benefits.